MORGAN, LEWIS & BOCKIUS LLP
Charles J. Malaret, Bar No. 144001
charles.malaret@morganlewis.com
Kathryn T. McGuigan, Bar No. 232112
kathryn.mcguigan@morganlewis.com
Emily L. Calmeyer, Bar No. 307432
emily.calmeyer@morganlewis.com
300 South Grand Avenue
Twenty-Second Floor
Los Angeles, CA 90071-3132
Tel:  +1.213.612.2500
Fax:  +1.213.612.2501

Attorneys for Defendants,
RAYMOND FU and SHISEIDO AMERICAS
CORPORATION (f/k/a GIARAN, INC.)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| VASO GOUNTOUMAS, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>GIARAN, INC., a Delaware corporation; RAYMOND FU, an individual, and DOES 1-10, inclusive,<br><br>Defendants. | Case No. 2:18-CV-07720-JFW-PJW<br><br>**DECLARATION OF YUN "RAYMOND" FU IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION AND TO DISMISS, OR IN THE ALTERNATIVE STAY ACTION**<br><br>*[Notice of Motion and Motion; Memorandum of Points and Authorities; Declaration of Charles Malaret; and [Proposed] Order filed concurrently herewith]*<br><br>*Honorable John F. Walter*<br>Place:  Courtroom 7A<br>       United States Courthouse<br>       350 W. 1st Street<br>       Los Angeles, CA 90012<br><br>Date:  November 19, 2018<br>Time:  1:30 p.m. |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 35091171.1

## DECLARATION OF YUN "RAYMOND" FU

I, Yun "Raymond" Fu, declare and state as follows:

1.      I am the founder of Giaran, Inc. ("Giaran") and a professor at Northeastern University.  In my role at Giaran, I had multiple interactions with Vaso Gountoumas ("Plaintiff"), Plaintiff in the above-titled action.  I have personal knowledge of the following facts and could and would testify competently to them if called to do so.

2.      Giaran, a Delaware company, had its headquarters in Boston, Massachusetts, before being acquired by Shiseido Americas Corporation ("Shiseido").

3.      Giaran is an instant and interactive virtual makeup robot that provides users a virtual try-on experience of their cosmetics products in-store, online, or on-the-go, with exact color-match and recommendations customized to individual face-shape, skin tone and texture.  It acts as a virtual makeover tool.

4.      I created Giaran based on patented technology that I developed over sixteen years of research and development.

5.      In May 2016, Plaintiff responded to a full-time job posting for a "Business Development Manager" at Giaran in Boston, Massachusetts.  The posting was on a Harvard Business School website and stated the position would be based in Boston.  Plaintiff applied for the position and although she had no experience in the cosmetic industry, she expressed her passion for the cosmetics, beauty and fashion industries.

6.      At the time she applied for the position, Plaintiff was living in Los Angeles, but acknowledged in her email response to the posting that, "I am aware this position is based in Boston, and am willing to relocate should I be a good fit with your company, but would require a 2-week notice with my current employer."

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 35091171.1

1

DECLARATION OF YUN "RAYMOND" FU ISO
DEFENDANTS' MOTION TO COMPEL ARBITRATION

1  A true and correct copy of Plaintiff's email response is attached hereto as **Exhibit**

2  **1**.

3         7.     During the latter part of 2016, and into 2017, Plaintiff volunteered to

4  perform consulting tasks for Giaran to see if she was a good fit for the company.

5  During this time, I negotiated with Plaintiff the terms of Plaintiff's consulting

6  arrangement with Giaran, and her agreement to relocate to Boston.

7         8.     I negotiated the terms of Plaintiff's Consulting Agreement with

8  Plaintiff.  The Consulting Agreement was memorialized in writing and Plaintiff

9  signed the Consulting Agreement to perform certain services for Giaran.  A true

10  and correct copy of the Consulting Agreement that Plaintiff signed is attached

11  hereto as **Exhibit 2**.  Plaintiff's work performed for Giaran was either pursuant to

12  and relating to the Consulting Agreement she executed.

13         9.     As part of this relationship, I offered Plaintiff, on behalf of Giaran a

14  written stock purchase arrangement, signaling my commitment to her future role at

15  the company.  The stock purchase agreement offered to Plaintiff related to the

16  consulting work that she agreed to perform for Giaran in Boston.  The stock

17  purchase agreement required Plaintiff to work for Giaran for one year before any

18  stock vested.

19        10.    Despite her promise to move to Boston, on February 6, 2017, Plaintiff

20  informed me that she would not move to Boston.  Based on Plaintiff's refusal to

21  move to Boston, Plaintiff's relationship with Giaran (and me) deteriorated

22  thereafter.  As of March 2017, Plaintiff was no longer in communication with me

23  and Giaran and did not perform any consulting tasks thereafter.

24        11.    In November 2017, Shiseido acquired Giaran.

25  ///

26  ///

27  ///

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 35091171.1

DECLARATION OF YUN "RAYMOND" FU ISO
DEFENDANTS' MOTION TO COMPEL ARBITRATION

1         I declare under penalty of perjury under the laws of the United States that the

2    foregoing is true and correct.

3         Executed at Boston, Massachusetts on October 15, 2018.

4

5                        Yun "Raymond" Fu

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 35091171.1

3

DECLARATION OF YUN "RAYMOND" FU ISO
DEFENDANTS' MOTION TO COMPEL ARBITRATION

# EXHIBIT 1

te: Business Development Manager Giaran

**Subject:** Re: Business Development Manager Giaran
**From:** Vaso Gountoumas <vgountoumas@gmail.com>
**Date:** 5/11/2016 1:01 PM
**To:** giarantech@gmail.com

Hi Ray,

I am currently based in LA, however, a friend of mine passed along your contact info to me, thinking I would be a great match to the qualifications you are looking for. Not only do I have extensive experience in business development and relationship management, I am extremely passionate about cosmetics, beauty and the fashion industry.

I am aware this position is based in Boston, and am willing to relocate should I be a good fit with your company, but would require a 2-week notice with my current employer.

Best Regards,
Vaso


On Wed, May 11, 2016 at 9:51 AM, <giarantech@gmail.com> wrote:
> Vaso
> Thanks for your email . Are you located in Boston? How do you get my hiring info?
>
> Thanks
> Ray

On May 11, 2016, at 12:25 PM, Vaso Gountoumas <vgountoumas@gmail.com> wrote:

> Hi Ray,
>
> I am interested in the above position you are hiring for. I believe that my international profile and experience are a good fit for the candidate you are looking for.
>
> Attached, please find my CV and cover letter. I look forward to speaking with you regarding this opportunity should you feel my profile is a match as well.
>
> Regards,
> Vaso
> --
> **Vaso Mary Gountoumas**
> IE Business School - International MBA 2013
> HKUST Business School
> U.S. Mobile (+1) 310 648 4301
>
> <Vaso Gountoumas -resume.pdf>

Re: Business Development Manager Giaran

<VASO COVER.docx>

--
**Vaso Mary Gountoumas**
IE Business School - International MBA 2013
HKUST Business School
U.S. Mobile (+1) 310 648 4301

3/14/2018 10:19 PM

EX. 1, Page 6

# EXHIBIT 2

# CONSULTING AGREEMENT

Effective February 1st, 2017, **Vaso Gountoumas** ("Consultant") and **Giaran, Inc.** ("Company") agree as follows:

1.     <u>Services; Payment; No Violation of Rights or Obligations</u>.  Consultant agrees to undertake and complete the Services (as defined in <u>Exhibit A</u>) in accordance with and on the schedule specified in <u>Exhibit A</u>.  As the only consideration due Consultant regarding the subject matter of this Agreement, Company will pay Consultant as (and only as) expressly stated in <u>Exhibit A</u>. Unless otherwise specifically agreed upon by Company in writing (and notwithstanding any other provision of this Agreement), all activity relating to Services will be performed by and only by Consultant [or by employees of Consultant who have been approved in writing in advance by Company]. Consultant agrees that it will not (and will not permit others to) violate any agreement with or rights of any third party or, except as expressly authorized by Company in writing hereafter, use or disclose at any time Consultant's own or any third party's confidential information or intellectual property in connection with the Services or otherwise for or on behalf of Company.

2.     <u>Ownership; Rights; Proprietary Information; Publicity</u>.

    a.     Company shall own all right, title and interest (including patent rights, copyrights, trade secret rights, mask work rights, trademark rights, *sui generis* database rights and all other intellectual property rights of any sort throughout the world) relating to any and all inventions (whether or not patentable), works of authorship, mask works, designations, designs, know-how, ideas and information made or conceived or reduced to practice, in whole or in part, by or for or on behalf of Consultant [during the term of this Agreement that relate to the subject matter of or arise out of or] in connection with the Services or any Proprietary Information (as defined below) (collectively, "Inventions") and Consultant will promptly disclose and provide all Inventions to Company.  All Inventions are work made for hire to the extent allowed by law and, in addition, Consultant hereby makes all assignments necessary to accomplish the foregoing ownership.  Consultant shall assist Company, at Company's expense, to further evidence, record and perfect such assignments, and to perfect, obtain, maintain, enforce and defend any rights assigned.  Consultant hereby irrevocably designates and appoints Company as its agents and attorneys-in-fact, coupled with an interest, to act for and on Consultant's behalf to execute and file any document and to do all other lawfully permitted acts to further the foregoing with the same legal force and effect as if executed by Consultant and all other creators or owners of the applicable Invention.

    b.     Consultant agrees that all Inventions and all other business, technical and financial information (including, without limitation, the identity of and information relating to customers or employees) developed, learned or obtained by or for or on behalf of Consultant in connection with the Services or that are received by or for Company in confidence, constitute "Proprietary Information."  Consultant shall hold in confidence and not disclose or, except in performing the Services, use any Proprietary Information.  However, Consultant shall not be obligated under this paragraph with respect to information Consultant can document is or

becomes readily publicly available without restriction through no fault of Consultant. Upon termination or as otherwise requested by Company, Consultant will promptly provide to Company all items and copies containing or embodying Proprietary Information, except that Consultant may keep its personal copies of its compensation records and this Agreement. Consultant also recognizes and agrees that Consultant has no expectation of privacy with respect to Company's telecommunications, networking or information processing systems (including, without limitation, stored computer files, email messages and voice messages) and that Consultant's activity, and any files or messages, on or using any of those systems may be monitored at any time without notice.

c.      As additional protection for Proprietary Information, Consultant agrees that during the period over which it is to be providing the Services (i) and for one year thereafter, Consultant will not directly or indirectly encourage or solicit any employee or consultant of Company to leave Company for any reason and (ii) Consultant will not engage in any activity that is in any way competitive with the business or demonstrably anticipated business of Company, and Consultant will not assist any other person or organization in competing or in preparing to compete with any business or demonstrably anticipated business of Company.

d.      To the extent allowed by law, Section 2.a and any license granted Company hereunder includes all rights of paternity, integrity, disclosure and withdrawal and any other rights that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like. Furthermore, Consultant agrees that notwithstanding any rights of publicity, privacy or otherwise (whether or not statutory) anywhere in the world, and without any further compensation, (i) Company may and is hereby authorized to (and to allow others to) use Consultant's name in connection with promotion of its business, products or services. To the extent any of the foregoing is ineffective under applicable law, Consultant hereby provides any and all ratifications and consents necessary to accomplish the purposes of the foregoing to the extent possible. Consultant will confirm any such ratifications and consents from time to time as requested by Company. If any other person is in any way involved in any Services, Consultant will obtain the foregoing ratifications, consents and authorizations from such person for Company's exclusive benefit.

e.      If any part of the Services or Inventions or information provided hereunder is based on, incorporates, or is an improvement or derivative of, or cannot be reasonably and fully made, used, reproduced, distributed and otherwise exploited without using or violating technology or intellectual property rights owned by or licensed to Consultant (or any person involved in the Services) and not assigned hereunder, Consultant hereby grants Company and its successors a perpetual, irrevocable, worldwide royalty-free, non-exclusive, sublicensable right and license to exploit and exercise all such technology and intellectual property rights in support of Company's exercise or exploitation of the Services, Inventions, other work or information performed or provided hereunder, or any assigned rights (including any modifications, improvements and derivatives of any of them).

3.      <u>Warranties and Other Obligations</u>.  Consultant represents, warrants and covenants that:  (i) the Services will be performed in a professional and workmanlike manner and that none of such Services nor any part of this Agreement is or will be inconsistent with any

2

obligation Consultant may have to others; (ii) all work under this Agreement shall be Consultant's original work and none of the Services or Inventions nor any development, use, production, distribution or exploitation thereof will infringe, misappropriate or violate any intellectual property or other right of any person or entity (including, without limitation, Consultant); (iii) Consultant has the full right to allow it to provide Company with the assignments and rights provided for herein (and has written enforceable agreements with all persons necessary to give it the rights to do the foregoing and otherwise fully perform this Agreement [and, in addition, Consultant will have each person who may be involved in any way with, or have any access to, any Services or Proprietary Information will enter into (prior to any such involvement or access) a binding agreement for Company's benefit in the form of Attachment __, or such other replacement form as may requested by Company]; (iv) Consultant shall comply with all applicable laws and Company safety rules in the course of performing the Services; and (v) if Consultant's work requires a license, Consultant has obtained that license and the license is in full force and effect.

        4.    <u>Termination</u>.  If either party breaches a material provision of this Agreement, the other party may terminate this Agreement upon 30 days' notice, unless the breach is cured within the notice period.  Company also may terminate this Agreement at any time, with or without cause, upon 30 days' notice, but, if (and only if) such termination is without cause, Company shall upon such termination pay Consultant all unpaid, undisputed amounts due for the Services completed prior to notice of such termination.  Sections 2 (subject to the limitations set forth in Section 2.c) through 8 of this Agreement and any remedies for breach of this Agreement shall survive any termination or expiration.  Company may communicate the obligations contained in this Agreement to any other (or potential) client or employer of Consultant.

        5.    <u>Relationship of the Parties; Independent Contractor; No Employee Benefits</u>.  Consultant is an independent contractor (not an employee or other agent) solely responsible for the manner and hours in which the Services are performed, is solely responsible for all taxes, withholdings and other statutory, regulatory or contractual obligations of any sort (including, but not limited to, those relating to workers' compensation, disability insurance, Social Security, unemployment compensation coverage, the Fair Labor Standards Act, income taxes, etc.), and is not entitled to participate in any employee benefit plans, fringe benefit programs, group insurance arrangements or similar programs of Company.  Consultant will ensure that its employees, contractors and others involved in the Services, if any, are bound in writing to the foregoing, and to all of Consultant's obligations under any provision of this Agreement, for Company's benefit and Consultant will be responsible for any noncompliance by them.  Consultant agrees to indemnify Company from any and all claims, damages, liability, settlement, attorneys' fees and expenses, as incurred, on account of the foregoing or any breach of this Agreement or any other action or inaction by or for or on behalf of Consultant.

        6.    <u>Assignment</u>.  This Agreement and the services contemplated hereunder are personal to Consultant and Consultant shall not have the right or ability to assign, transfer or subcontract any rights or obligations under this Agreement without the written consent of Company.  Any attempt to do so shall be void.  Company may fully assign and transfer this Agreement in whole or part.

3

7.     Notice.  All notices under this Agreement shall be in writing and shall be deemed given when personally delivered, or three days after being sent by prepaid certified or registered U.S. mail to the address of the party to be noticed as set forth herein or to such other address as such party last provided to the other by written notice.

8.     Miscellaneous.  Any breach of Section 2 or 3 will cause irreparable harm to Company for which damages would not be an adequate remedy, and therefore, Company will be entitled to injunctive relief with respect thereto in addition to any other remedies.  The failure of either party to enforce its rights under this Agreement at any time for any period shall not be construed as a waiver of such rights.  This Agreement represents the entire understanding between the parties with respect to the subject matter hereof to the exclusion of all other terms and conditions, and no changes, additions, modifications or waivers to this Agreement will be effective unless in writing and signed by both parties.  In the event that any provision of this Agreement shall be determined to be illegal or unenforceable, that provision will be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable.  This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts without regard to the conflicts of laws provisions thereof.  In any action or proceeding to enforce rights under this Agreement, the prevailing party will be entitled to recover costs and attorneys' fees.  Headings herein are for convenience of reference only and shall in no way affect interpretation of the Agreement.

9.     Arbitration.  Any controversy or claim (except those regarding Inventions, Proprietary Information or intellectual property) arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof, provided however, that each party will have a right to seek injunctive or other equitable relief in a court of law.  The prevailing party will be entitled to receive from the nonprevailing party all costs, damages and expenses, including reasonable attorneys' fees, incurred by the prevailing party in connection with that action or proceeding, whether or not the controversy is reduced to judgment or award. The prevailing party will be that party who may be fairly said by the arbitrator(s) to have prevailed on the major disputed issues.  Consultant hereby consents to the arbitration in the Commonwealth of Massachusetts in the county of Suffolk.

| Vaso Gountoumas | Giaran, Inc. |
|---|---|
| (Consultant) | (Company) |
| By *Vaso Gountoumas* | By _____ |
| Vaso Gountoumas | Yun Fu, President |
| Printed (Name, Title and Address) | Printed (Name, Title and Address) |

4

# **EXHIBIT A**

**SERVICES** (IF THE SERVICES ARE FOR A FIXED TERM, STATE IT HERE:  ; IF NO FIXED TERM IS STATED THE TERM WILL CONTINUE UNTIL THE SERVICES ARE COMPLETED OR THE AGREEMENT IS TERMINATED UNDER SECTION 4, WHICHEVER OCCURS FIRST.) THE SERVICES ARE AS FOLLOWS:

Marketing, Business Development, Team Setup, Management

**FEES/EXPENSES** (APPLICABLE ONLY WHERE CHECKED AND COMPLETED)

__X__   Hourly fee of $ __30__ for Services expressly requested in writing by Company (provided that such hours are consistent with Consultant's written estimate of such hours provided by Consultant in advance of such Services and provided that Company may withdraw requests for Services at any time) exclusive of travel time, payable monthly in arrears 10 days after receipt of an invoice detailing hours, with a cap of $ __4,500__ in the aggregate. Monthly tracking hours table shall be provided and justified. Actually numbers for hours and monthly total maybe adjusted based on the actual services each month.

___   Up to 16 hours per week services. Monthly fee of $ _____ payable within 10 days after the end of each month.

__X__   Expense reimbursement (even if this item is checked, and therefore applicable, reimbursement is (1) limited to required, reasonable telephone expenses and long distance coach class (or equivalent) travel (transportation, lodging and meals) authorized in writing by Company in advance, and (2) payable 10 days after itemized invoice and delivery of receipts).