NAVID YADEGAR, SBN 205315
   e-mail:  navid@ymsllp.com
NAVID SOLEYMANI, SBN 219190
   e-mail:  soleymani@ymsllp.com
YADEGAR, MINOOFAR & SOLEYMANI LLP
1875 Century Park East, Suite 1240
Los Angeles, CA  90067-3206
Telephone:  (310) 499-0140
Facsimile:  (888) 667-9576

Attorneys for Plaintiff
*Vaso Gountoumas*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VASO GOUNTOUMAS, an individual;<br><br>        Plaintiffs,<br><br>  vs.<br><br>GIARAN, INC., a Delaware Corporation;<br>RAYMOND FU, an individual, and<br>DOES 1 - 10, inclusive,<br><br>        Defendants. | Case No. 2:18-CV-07720-JFW-PJW<br><br>[Hon. John F. Walter]<br><br>**PLAINTIFF'S OPPOSITION TO THE MOTION TO COMPEL ARBITRATION AND TO DISMISS, OR IN THE ALTERNATIVE, STAY ACTION**<br><br>[Declarations of Navid Yadegar and Vaso Gountoumas filed concurrently herewith]<br><br>Place:  Courtroom 7A<br>          United States Courthouse<br>          350 W. 1st Street<br>          Los Angeles, CA 90012<br><br>Date:  November 19, 2018<br>Time:  1:30 p.m. |

# **Table of Contents**

I.   INTRODUCTION ..................................................................................................1

II.  FACTUAL BACKGROUND ...............................................................................2

    A.   From May Through August 2016, Gountoumas Provided Services With The Hope That Giaran Would Offer Her A Position And Equity ..........................2

    B.   In September 2016, The Parties Reached An Oral Agreement By Which Gountoumas Received a 15% Ownership Interest in Giaran ..........................3

    C.   From September Through November 2016, Gountoumas Worked Hard For Giaran Because She Understood She Was A 15% Shareholder ...................4

    D.   In Late November 2016, Fu Demanded That Gountoumas Move To Boston, Which Led To Discussions About Revising The Oral Agreement ................4

    E.   On November 30, 2016, Fu Sent An Email With The Terms of the Proposed Revision, Which Was To Be Memorialized In Two Agreements .................5

    F.   On December 6, 2016, Fu Sent A Consulting Agreement That Contained The Salary Component, But Not The Equity Component ............................6

    G.   On February 1, 2017, Fu Sent A Shareholder Agreement to Gountoumas, Which Was Inconsistent With The Proposed Revision ..................................6

    H.   In Mid-February 2017, Giaran Terminated And Repudiated All Agreements With Gountoumas, And Refused To Pay Her Anything.................................7

III. SUMMARY OF THE CLAIMS IN THE COMPLAINT ...........................................8

IV. THE MOTION TO COMPEL ARBITRATION SHOULD BE DENIED .................8

    A.   The Consulting Agreement Is Not Enforceable Under State Law Principles Governing Formation And Rescission .............................................................8

        1.   California Law Applies To The Contract Formation Issues....................9

2.  The Consulting Agreement Is Not Enforceable Because It Was Intended To Be One Component Of The Proposed Revision, And The Parties Did Not Agree On The Other Component ......................................................10

3.  Even If The Parties Entered Into The Consulting Agreement, They Mutually Rescinded It By Abandoning It ...............................................11

B.  Even If The Consulting Agreement Is Enforceable, The Arbitration Provision Does Not Apply To Gountoumas' Claims ....................................12

C.  The Arbitration Provision Is Unenforceable Because It Is Unconscionable.14

1.  The Arbitration Agreement Is Procedurally Unconscionable.................14

2.  The Arbitration Agreement Is Substantively Unconscionable ..............15

3.  The Unconscionable Provisions Are Not Severable ..............................20

D.  The Court, Not The Arbitrator, Must Determine Arbitrability ....................21

1.  The Agreement Does Not "Clearly And Unmistakably" Delegate The Gateway Issues To Arbitration, Particularly In Light of Gountoumas' Lack of Sophistication In Legal Matters .................................................22

2.  Even If the Delegation Clause Was "Clear And Unmistakable," The Delegation Provision Is Itself Unconscionable......................................23

V.  CONCLUSION ........................................................................................................25

1

<u>**Table Of Authorities**</u>

2

<u>**Federal Cases:**</u>

3

*Anderson v. Pitney Bowes, Inc.*,
4        2005 U.S. Dist. Lexis 37662 (N.D. Cal. May 4, 2005)..........................21, 22

5
*Asher v. E! Entm't TV, LLC*,
6        2017 U.S. Dist. Lexis 131579 (C.D. Cal. Aug. 17, 2017).....................9

7
*AT&T Technologies, Inc. v. Communication Workers of Am.*,
8        475 U.S. 643 (1986) ......................................................................12

9
*Circuit City Stores v. Adams*,
10       279 F.3d 889 (9th Cir. 2002)...................................................14, 18

11
*Comb v. PayPal, Inc.*,
       218 F. Supp. 2d 1165 (N.D. Cal. 2002) ...................................17
12
*Davies v. Broadcom Corp.*,
13       130 F. Supp. 3d 1343 (C.D. Cal. 2015)...................................12, 13

14
*Gutierrez v. Carter Bros. Sec. Servs., LLC*,
15       63 F. Supp. 3d 1206 (N.D. Cal. 2015). ...................................14

16
*Inamed Corp. v. Kuzmak*,
17       275 F. Supp. 2d 1100 (C.D. Cal. 2002)...................................10

18
*Ingalls v. Spotify USA, Inc.*,
19       2016 U.S. Dist. Lexis 157384 (N.D. Cal. Nov. 14, 2016) .....................23

20
*Jacovides v. Future Foam*,
21       2016 U.S. Dist. Lexis 57530 (C.D. Cal. Apr. 25, 2016) ........................8

22
*Kahn Creative P'ships, Inc. v. Nth Degree, Inc.*,
23       2011 U.S. Dist. Lexis 34248 (C.D. Cal. Mar. 29, 2011)........................10

24
*Knutson v. Sirius XM Radio Inc.*,
       771 F.3d 559 (9th Cir. 2014) ...................................................14
25
*Lang v. Skytap, Inc.*,
26       2018 U.S. Dist. Lexis 182701 (N.D. Cal. Oct. 24, 2018) .....................16

27
*Maganallez v. Hilltop Lending Corp.*,
28       505 F. Supp. 2d 594 (N.D. Cal. 2007) ...................................9

**PLAINTIFF'S OPPOSITION TO THE MOTION TO COMPEL ARBITRATION**

*Malhotra v. De Ora,*
   673 F. App'x 666 (9th Cir. 2016)........................................................13

*Meadows v. Dickey's Barbecue Rests., Inc.,*
   144 F. Supp. 3d 1069 (N.D. Cal. 2015) ...............................................22, 23

*Mikhak v. Univ. of Phoenix,*
   2016 U.S. Dist. Lexis 80705 (N.D. Cal. June 21, 2016) .......................21, 22

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,*
   473 U.S. 614 (1985). ..........................................................................8

*Mohamed v. Uber Techs, Inc.,*
   848 F.3d 1201 (9th Cir. 2016)...........................................................21, 22, 23

*Nagrampa v. MailCoups, Inc.,*
   469 F.3d 1257 (9th Cir. 2006) ............................................................17

*Oracle Am., Inc. v. Myriad Group., A.G.,*
   724 F.3d 1069 (9th Cir. 2013) ............................................................8

*Perfumebay.com Inc. v. eBay Inc.,*
   506 F.3d 1165 (9th Cir. 2007).............................................................10

*Pokorny v. Quixtar, Inc.,*
   601 F.3d 987 (9th Cir. 2010) ..............................................................9

*Pompliano v. Snap, Inc.,*
   2018 U.S. Dist. Lexis 107357 (C.D. Cal. April 11, 2018) .....................21, 23, 25

*Rent-A-Center v. Jackson,*
   561 U.S. 68 (2010) ............................................................................22, 23

*Simula, Inc. v. Autoliv, Inc.,*
   175 F.3d 716 (9th Cir. 1999)...............................................................12

*Tompkins v. 23andMe, Inc.,*
   2014 U.S. Dist. Lexis 88068 (N.D. Cal. June 25, 2014) ........................23

*Tompkins v. 23andMe, Inc.,*
   834 F.3d 1019 (9th Cir. 2016).............................................................24

*Vargas v. Delivery Outsourcing, LLC,*
   2016 U.S. Dist. Lexis 32634 (N.D. Cal. Mar. 14, 2016)........................16

**PLAINTIFF'S OPPOSITION TO THE MOTION TO COMPEL ARBITRATION**

*Yan Guo v. Kyani, Inc.*,
    311 F. Supp. 3d 1130 (C.D. Cal. 2018)..................................... 22

**State Cases:**

*Ajamian v. CantorCO2e, L.P.*,
    203 Cal. App. 4th 771 (2012) .......................................18, 19

*Arave v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    19 Cal. App. 5th 525 (2018)...........................................18

*Armendariz v. Foundation Health Psychcare Services, Inc.*,
    24 Cal. 4th 83 (2000)..............................................*passim*

*Baltazar v. Forever 21, Inc.*,
    62 Cal. 4th 1237 (2016) ..............................................20

*Baxter v. Genworth North Am. Corp.*,
    16 Cal. App. 5th 713 (2017).......................................14, 15

*Bolter v. Superior Court*,
    87 Cal. App. 4th 900 (2001) ..........................................17

*Carlson v. Home Team Pest Defense, Inc.*,
    239 Cal. App. 4th 619 (2015)..........................................18

*Carmona v. Lincoln Millennium Car Wash*,
    226 Cal. App. 4th 74 (2014) ......................................14, 20

*Fitz v. NCR Corp.*
    118 Cal. App. 4th 702 (2004) .....................................19, 20

*Garcia v. Seacon Logix, Inc.*,
    238 Cal. App. 4th 1476 (2015).........................................9

*Honda v. Reed*,
    156 Cal. App. 2d 536 (1958)......................................11, 12

*Martin v. Butter*,
    93 Cal. App. 2d 562 (1949)...........................................11

*Martinez v. Master Protection Corp.*,
    118 Cal. App. 4th 107 (2004) .................................18, 20, 21

*Pearson Dental Supplies, Inc. v. Superior Court*,
    48 Cal. 4th 665 (2010)................................................................19

*Penilla v. Westmont Corp.*,
    3 Cal. App. 5th 205 (2016).......................................................15

*Pinela v. Neiman Marcus Group, Inc.*,
    238 Cal. App. 4th 227 (2015)...................................................24

*Samaniego v. Empire Today, LLC*,
    205 Cal. App. 4th 1138 (2012)..................................................14

*Sanchez v. Western Pizza Enterprises, Inc.*,
    172 Cal. App. 4th 154 (2009)...................................................15

*Serafin v. Balco Properties Ltd., LLC*,
    235 Cal. App. 4th 165 (2015) ..................................................14

*Tiri v. Lucky Chances, Inc.*,
    226 Cal. App. 4th 231 (2014)...................................................14

*Trivedi v. Curexo Technology Corp.*,
    189 Cal. App. 4th 387 (2010)...................................................19

*Truly Nolen of Am. v. Superior Court*
    208 Cal. App. 4th 487 (2012)...................................................16

*Verdugo v. Alliantgroup, L.P.*,
    237 Cal. App. 4th 141 (2015) ..................................................16

*Weddington Productions, Inc. v. Flick*,
    60 Cal. App. 4th 793 (1998)...............................................10, 11

*Wherry v. Award, Inc.*,
    192 Cal. App. 4th 1242 (2011)..................................................14

*Wimsatt v. Beverly Hills Weight Loss Clinic Int'l*,
    32 Cal. App. 4th 1511 (1995) ..................................................16

**PLAINTIFF'S OPPOSITION TO THE MOTION TO COMPEL ARBITRATION**

**<u>State Statutes</u>**

Cal. Civ. Proc. Code § 1286.2.................................................................19

Cal. Lab. Code § 925 ..............................................................9, 16, 17

Mass. Ann. Laws ch. 251, § 12...............................................................19

PLAINTIFF'S OPPOSITION TO THE MOTION TO COMPEL ARBITRATION

1  **I.    <u>INTRODUCTION</u>**

2         In this action, Plaintiff Vaso Gountoumas ("Gountoumas") contends that, in

3  September 2016, she entered into an oral agreement with Defendants Giaran, Inc.

4  ("Giaran") and its Chief Executive Officer, Yun Raymond Fu ("Fu"), in which they

5  agreed that Gountoumas would provide services as the company's Chief Marketing

6  Officer ("CMO"), in exchange for a 15% vested ownership interest in Giaran (the "Oral

7  Agreement").  From September 2016 through February 2017, Gountoumas performed

8  under the Oral Agreement, with the understanding that she was a 15% shareholder.  But,

9  Giaran breached the Oral Agreement.  Giaran and Fu kicked Gountoumas out of the

10  company, took away her shares, and did not otherwise pay her for months of work.

11        The Complaint alleges a breach of the Oral Agreement and other claims that arise

12  from the Oral Agreement.  The Complaint also asserts various claims under the

13  California Labor Code, because Gountoumas contends that either she provided services

14  as a shareholder under the Oral Agreement, or she was an employee.

15        Giaran seeks to deprive Gountoumas of her right to a jury trial by relying on an

16  arbitration provision in a "Consulting Agreement."  But, Giaran's motion ignores the

17  history preceding the Consulting Agreement which demonstrates that the Consulting

18  Agreement does not constitute an enforceable contract.  In November 2016, about two

19  months after the parties entered into the Oral Agreement, Fu demanded that Gountoumas

20  move to Boston.  Gountoumas said she was willing to move only if she receives a salary

21  from Giaran.  In turn, Fu said that Giaran will pay her a salary if she accepts a reduction

22  in her equity from 15% to 10%.  These changes are referred to herein as the "Proposed

23  Revision," because they were intended modify the Oral Agreement.  The Consulting

24  Agreement was intended to memorialize the salary component of the Proposed Revision.

25  There was another document to memorialize the equity component of the Proposed

26  Revision – but the parties were unable to agree to those terms.  In short, the Consulting

27  Agreement is not enforceable because it was intended to be one component of the

28  Proposed Revision, and the parties did not agree on the other component.

**PLAINTIFF'S OPPOSITION TO THE MOTION TO COMPEL ARBITRATION**

1    More significant, the claims in dispute have no relationship (certainly no

2    "significant relationship") to the Consulting Agreement.  The Consulting Agreement

3    relates to a different time period and a different subject matter than the Oral Agreement

4    that forms the basis of this lawsuit.  The Consulting Agreement was effective on

5    February 1, 2017 – months after the Oral Agreement and the work that Gountoumas

6    provided.  The Consulting Agreement does not address at all Gountoumas' ownership in

7    Giaran, which is the central issue in dispute.  Further, neither party performed under the

8    Consulting Agreement, and both parties rescinded it by mutually abandoning it.

9    Even if the Consulting Agreement had any bearing on the claims, the arbitration

10   provision is unconscionable.  The provision is procedurally unconscionable because Fu

11   threatened to end the parties' relationship and pay Gountoumas nothing for the months of

12   work she already had performed, unless she agreed to the Proposed Revision.  The

13   provision is substantively unconscionable because: (a) it contains a Massachusetts choice

14   of law provision that will force Gountoumas to waive her claims under the California

15   Labor Code; (b) Gountoumas cannot afford to arbitrate in Massachusetts, pursuant to the

16   forum selection clause; (c) the provision forces Gountoumas to pay for one-half the cost

17   of arbitration; (d) the provision imposes the wrong standard for recovery of attorneys'

18   fees; (e) the provision limits judicial review; and (f) it denies adequate discovery.

19   Finally, the Court, not the arbitrator, must decide the arbitrability issues.  The

20   arbitration provision does not "clearly and unmistakably" delegate the arbitrability issues

21   to the arbitrator.  In any event, the delegation clause (when read together with foreign

22   state choice of law clause) is unconscionable under binding California law, because it

23   would preclude the arbitrator from applying California unconscionability standards in

24   determining whether the agreement as a whole is unconscionable.

25   **II.    FACTUAL BACKGROUND**

26   **A.    From May Through August 2016, Gountoumas Provided Services With
        The Hope That Giaran Would Offer Her A Position And Equity**

27   In or about May 2016, Gountoumas applied for a job with Giaran in response to a

28   posting for a Business Development Manager.  During the next few months, Gountoumas

had a series of calls with Giaran's CEO, Yun Fu ("Fu"), so that she could learn about Giaran, and so that she could discuss her background and experience.  As part of these calls, Gountoumas presented her vision for the company to Fu and the company's other founders.  During these conversations, Fu discussed making Gountoumas an officer, co-founder, and shareholder in the company.  This was obviously different than the job for which Gountoumas initially had applied.  (Gountoumas Decl. ¶¶ 2-5.)

Thereafter, and continuing through August 2016, Gountoumas conducted market and consumer research for Giaran.  She performed these services during the May through August period with the hope that, if Fu was satisfied with her work, he would offer her a prominent position and an equity stake in Giaran.  (Gountoumas Decl. ¶ 6.)

**B.   In September 2016, The Parties Reached An Oral Agreement By Which Gountoumas Received a 15% Ownership Interest in Giaran**

On or about August 30, 2016, Gountoumas met with Fu in Boston.  They discussed Gountoumas' research, the work she had completed, and her vision for Giaran.  Fu told Gountoumas that he was impressed with her and her presentation.  He told her he would meet with her within a couple of weeks in Los Angeles to discuss making her a cofounder and giving her an ownership interest in Giaran.  (Gountoumas Decl. ¶¶ 7-8.)

On September 13, 2016, Fu met with Gountoumas in Los Angeles.  Fu told her that he wanted her to serve as Giaran's Chief Marketing Officer.  Fu said that Giaran did not have any cash to pay her a salary.  Instead, Fu said he intended to compensate her by giving her a 15% cofounder ownership interest in Giaran.  (Gountoumas Decl. ¶¶ 10-11.)

Thereafter, in or about September 2016, Fu and Gountoumas had a telephonic conference in which Fu formally confirmed an offer of 15% cofounder ownership interest in Giaran, in exchange for Gountoumas serving as the Chief Marketing Officer and running the company's marketing and business development.  Fu said that the shares were deemed earned at the time of the grant, and he explained that Giaran was unable to provide her any other compensation beyond the 15% ownership interest.  Fu also said that Gountoumas could continue to work from Los Angeles.  Gountoumas accepted Fu's proposal (the "Oral Agreement").  (Gountoumas Decl. ¶¶ 12-14.)

### C.    From September Through November 2016, Gountoumas Worked Hard For Giaran Because She Understood She Was A 15% Shareholder

After Gountoumas became the CMO and a 15% shareholder, she performed various duties on behalf of Giaran.  Gountoumas' services during the September through November 2016 period are set forth in her declaration at paragraphs 15-20.  As discussed therein, Gountoumas created marketing and pricing strategies for Giaran; she developed plans for retailers to use in their customer relationship management database; she created a go-to-market strategy; she created investor PowerPoint pitch decks; she solicited meetings with, and conducted presentations for, investors; she created a promotional video for Giaran's entry into a start-up competition at MIT; and she worked on a grant application for Giaran.  (Gountoumas Decl. ¶¶ 15-20.)

Gountoumas performed these and other tasks during the September through November 2016 period, because, pursuant to the Oral Agreement, she understood she was the CMO and a 15% shareholder. (Gountoumas Decl. ¶ 20.)  During this time period, Giaran publicly and repeatedly referred to Gountoumas as Giaran's CMO and cofounder – which is also consistent with the Oral Agreement.  Fu referred to Gountoumas as the CMO or cofounder to investors and other third parties and on Giaran's website. (Gountoumas Decl. ¶ 21, Ex. 1-4.)

### D.    In Late November 2016, Fu Demanded That Gountoumas Move To Boston, Which Led To Discussions About Revising The Oral Agreement

In late November 2016, Fu demanded that Gountoumas move to Boston – even though he previously had agreed that Gountoumas could stay in Los Angeles. (Gountoumas Decl. ¶ 22.)  Gountoumas told Fu that such a move would be expensive because of the moving costs and the increased living costs.  Gountoumas told Fu that she could not afford to move to Boston and work without a salary.  Fu replied that he would pay her a salary, but only if she agreed to reduce her equity from 15% to 10%. (Gountoumas Decl. ¶¶ 23-25.)  Gountoumas asked Fu what would happen if she did not move to Boston.  Fu replied that staying in Los Angeles was not an option, and that if she did not accept the "revised agreement," he could pay her for the work she already performed, and they could part ways.  When Gountoumas asked Fu how much Giaran

would pay her for the work she had performed, Fu said he would pay her a flat ***one***

***hundred dollars*** for the past several months of work!  (Gountoumas Decl. ¶ 26.)

By this point, Gountoumas already had helped Giaran meet investors, conduct research, create a business plan, and finish its PowerPoint decks for investors.  She had delivered much of what Giaran had expected of her at that stage of the business.  Also, Gountoumas felt powerless because she had only secured Fu's verbal promise to deliver her a 15% ownership interest in Giaran.  Thus, feeling that she had no choice, she asked Fu to put the new proposed terms in an email.  (Gountoumas Decl. ¶¶ 27-28.)

**E.     On November 30, 2016, Fu Sent An Email With The Terms of the Proposed Revision, Which Was To Be Memorialized In Two Agreements**

On November 30, 2016, Fu sent Gountoumas an email with the terms of the "revised agreement" (Gountoumas Decl. ¶ 29, Ex. 5), referred to herein as the "Proposed Revision."  Fu wrote that starting from February 1, 2017, Gountoumas would receive a cash payment of $4,500 per month, plus a $1,000 relocation fee to move to Boston.  Fu added that Gountoumas would receive a 10% ownership interest in Giaran "vesting for 4 years, 1 year cliff, starting Jan. 1st 2017."  Fu also promised an opportunity to obtain an additional 5% ownership, with a four-year vesting on January 1, 2018, if Gountoumas was appointed to a C-Suite position by the board.  Gountoumas replied:  "Confirmed. Equity starting Jan 1st, 2017." (Gountoumas Decl. ¶¶ 29-30, Ex. 5.)

In retrospect, Gountoumas might not have understood the implications of "vesting" and "cliffs." Based on her discussion with Fu, she understood the Proposed Revision contained two separate, but critical components:  (a) a salary component and (b) an equity component that would reduce her equity interest from 15% to 10%, in January 2017 (with a possibility of increasing it back to 15% in January 2018).  Gountoumas understood that the parties would later negotiate a written shareholder agreement, and that she would hire an attorney to review it. (Gountoumas Decl. ¶¶ 31-33.)

**PLAINTIFF'S OPPOSITION TO THE MOTION TO COMPEL ARBITRATION**

### F. On December 6, 2016, Fu Sent A Consulting Agreement That Contained The Salary Component, But Not The Equity Component

On December 6, 2016, Fu sent Gountoumas a consulting agreement that contained the salary component of the Proposed Revision (the "Consulting Agreement"). (Gountoumas Decl. ¶ 34.)  The Consulting Agreement is attached to the moving papers.

The Consulting Agreement did not set forth the reduction of Gountoumas' equity interest from 15% to 10% -- nor did it contain any term regarding the equity component. By its terms, the Consulting Agreement was effective on February 1, 2017.  Gountoumas signed it on December 15, 2016, believing that it accurately stated the salary component of the Proposed Revision, and the parties would negotiate the equity portion prior to the effective date.  Giaran did not sign the Consulting Agreement.  (Gountoumas Decl. ¶ 35.)

In late December 2016, Gountoumas told Fu that before she moved to Boston, she would need to have a contract that set forth the equity component of the Proposed Revision.  Fu told Gountoumas that he will send her a shareholder agreement.  But, Fu kept stalling for time, while Gountoumas continued to work and add value.  And, Giaran continued to publicly tout Gountoumas as a cofounder (Gountoumas Decl. ¶¶ 36-37.)

By January 30, 2017 -- two days before the effective date of the Consulting Agreement -- Gountoumas still had not received an agreement that contained the equity component of the Proposed Revision.  Gountoumas insisted on having an official shareholder agreement from Giaran.  Incredibly, Fu responded that he did not know what a shareholder agreement was.  (Gountoumas Decl. ¶¶ 38-39; Ex. 6)

### G. On February 1, 2017, Fu Sent A Shareholder Agreement to Gountoumas, Which Was Inconsistent With The Proposed Revision

On February 1, 2017, one or two days after Fu claimed he did not know what a shareholder agreement was, Fu sent such an agreement to Gountoumas.  (Gountoumas Decl. ¶ 40.)  After reading the "Stock Purchase Agreement," Gountoumas realized that she was not treated as a "cofounder," and also that she had not been granted any equity. Rather, this agreement provided for the *potential* for Gountoumas to earn 2.5% interest *if* she remained with the company for at least a year, and the potential for earning a total of 10% interest *if* she remained with the company for four years.  Also, there was nothing in

the agreement about earning an additional 5% interest if she was appointed to a C-level position.  Gountoumas rejected this agreement.  (Gountoumas Decl. ¶¶ 41-42.)

But, Gountoumas continued to perform services for Giaran with the understanding that she was operating under the original Oral Agreement.  Fu knew that Gountoumas was continuing to work on Giaran's behalf.  (Gountoumas Decl. ¶ 43.)

On February 6, 2017, Fu sent Gountoumas a text message to pressure her to sign the new shareholder agreement.  He told her that she needs to "emotionally trust" him.  (Gountoumas Decl. ¶ 44, Ex. 8.)  Gountoumas refused.  She continued to perform services for Giaran under the Oral Agreement. (Gountoumas Decl. ¶ 45.)

On February 13, 2017, Fu tried again to convince her to accept the new shareholder agreement.  He told Gountoumas that she should trust him because "we are partners and when Giaran grows, you will get 15%, but not yet."  Gountoumas declined to sign the shareholder agreement.  (Gountoumas Decl. ¶¶ 46, 47, Ex. 7.)

### H. In Mid-February 2017, Giaran Terminated And Repudiated All Agreements With Gountoumas, And Refused To Pay Her Anything

On February 13, 2017, Fu sent Gountoumas an email saying that because she had not moved to Boston, he was rescinding and repudiating any agreement they had, including the Consulting Agreement.[1]  (Gountoumas Decl. ¶ 48, Ex. 5.)  Prior to this rescission, neither party had performed under the Consulting Agreement.  Gountoumas had not performed under that agreement, and Giaran had not paid Gountoumas anything under that agreement (or under any other agreement).  (Gountoumas Decl. ¶ 49, 51.)

On February 14, 2017, Fu told other employees to stop reporting to Gountoumas.  Fu stopped contacting Gountoumas and excluded her from meetings and conference calls.  Fu then deleted Gountoumas' company email account.  (Gountoumas Decl. ¶ 50.)

In short, Fu booted Gountoumas from Giaran, in violation of the Oral Agreement, and without compensating her at all for any of the work that she had performed.

---

[1] The Consulting Agreement does not say that Gountoumas was required to move to Boston.  Instead, Fu's demand that Gountoumas move to Boston precipitated the discussion to revise the Oral Agreement.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## III.    SUMMARY OF THE CLAIMS IN THE COMPLAINT

The gravamen of the Complaint is a claim for breach of the Oral Agreement, reached in September 2016, in which Fu promised Gountoumas a vested 15% ownership interest in Giaran.  The Complaint also states claims for declaratory relief, breach of the implied covenant, breach of fiduciary duty, accounting, and unjust enrichment.  These claims all arise from the Oral Agreement.

The Complaint asserts various claims under the California Labor Code because Gountoumas worked for Giaran from September 2016 through February 2017 without being paid.  Gountoumas contends that either she provided services as a shareholder under the Oral Agreement, *or* she was an employee and should have received wages.

The Complaint does not allege any claim relating to the Consulting Agreement. The Consulting Agreement did not come into effect until February 1, 2017 – months after Gountoumas had performed services.  And, it was one component of the Proposed Revision, and the parties did not agree as to the equity component.  Further, neither party performed under the Consulting Agreement, and they both abandoned it.

## IV.    THE MOTION TO COMPEL ARBITRATION SHOULD BE DENIED

### A.    The Consulting Agreement Is Not Enforceable Under State Law Principles Governing Formation And Rescission

The "first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985).  "The federal policy in favor of arbitration does not extend to deciding questions of arbitrability."  *Oracle Am., Inc. v. Myriad Group., A.G.*, 724 F.3d 1069, 1072 (9th Cir. 2013).  "The FAA does not apply until the existence of an enforceable arbitration agreement is established under state law principles involving formation, revocation, and enforcement of contracts generally." *Jacovides v. Future Foam*, 2016 U.S. Dist. Lexis 57530, at *7 (C.D. Cal. Apr. 25, 2016).

"When determining the validity of the arbitration agreement, the court should apply ordinary state-law principles that govern the formation of contracts, and the parties may challenge the validity through state-law defenses like unconscionability, duress, or

1    fraud." *Asher v. E! Entm't TV, LLC*, 2017 U.S. Dist. Lexis 131579 (C.D. Cal. Aug. 17,

2    2017).  "Moreover, because arbitration waives the important right to a jury trial, an

3    arbitration agreement must be clear and unambiguous; where there is doubt surrounding

4    whether a party has waived his or her right to a jury trial, the doubt should be resolved in

5    favor of preserving that right." *Maganallez v. Hilltop Lending Corp.*, 505 F. Supp. 2d 594,

6    602 (N.D. Cal. 2007).

7              ***1.     California Law Applies To The Contract Formation Issues***

8              As an initial matter, the Court must determine which state's law to apply to the

9    contract formation issues.  Giaran contends that Massachusetts law applies because of the

10   choice of law clause in the Consulting Agreement.  But, the choice of law clause can

11   apply only (if it all) to the substantive claims that Gountoumas asserts in this litigation –

12   not to the predicate issue of whether a valid contract was formed in the first instance. *See*

13   *Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 994 (9th Cir. 2010) (holding that choice-of-law

14   clause did not apply to contract formation issues; "the question of whether the [agreement

15   itself is] unconscionable does not fall within the scope of the choice-of-law clause").

16             The Court must apply California law in determining whether a valid agreement

17   with a California resident was formed.  The application of California law is mandated by

18   the Labor Code, which states that an employer may not require a California employee to

19   adjudicate her claims outside of California, and may not deprive the employee of the

20   substantive protections of California law.  Cal. Lab. Code § 925(a)(2).[2]

21             California law also is mandated by application of the governmental interest

22   analysis.  Under that analysis, Giaran had "the burden of identifying the conflict between

23   that state's law and California's law on the issue, and establishing that the foreign state

24   has an interest in having its law applied." *Pokorny*, 601 F.3d 987 at 995.  Giaran did not

25   _____

26   [2] This section applies to contracts entered into on or about January 1, 2017.  The
     Consulting Agreement was made effective as of February 1, 2017; thus, it is subject to
27   this statute.  Further, that the Consulting Agreement states that Gountoumas was an
     independent contractor is not dispositive under California law. *Garcia v. Seacon Logix,*
     *Inc.*, 238 Cal. App. 4th 1476, 1486 (2015).  And, Gountoumas alleges that she worked as
28   a shareholder or employee for months *before* that agreement was even discussed.

carry its burden on either issue.  Regardless, California has a greater interest in applying its laws to claims brought by a California resident.  *Id.*  (California had greater interests in applying its laws on unconscionability, where California residents were seeking to invalidate an arbitration agreement with a defendant headquartered in Michigan).

### 2.   *The Consulting Agreement Is Not Enforceable Because It Was Intended To Be One Component Of The Proposed Revision, And The Parties Did Not Agree On The Other Component*

Under California law, "if an essential element [of an agreement] is reserved for the future agreement of both parties, as a general rule the promise can give rise to no legal obligation until such future agreement.  Since either party in such a case may, by the very terms of the promise, refuse to agree to anything to which the other party will agree, it is impossible for the law to affix any obligation to such a promise." *Perfumebay.com Inc. v. eBay Inc.*, 506 F.3d 1165, 1178-1179 (9th Cir. 2007); *see Inamed Corp. v. Kuzmak*, 275 F. Supp. 2d 1100, 1120 (C.D. Cal. 2002) ("If an essential element of the promise is reserved for future agreement, there is no binding contract until the open point is resolved."). Further, "mutual consent cannot exist unless the parties agree upon the same thing in the same sense.  If there is no evidence establishing a manifestation of assent to the same thing by both parties, then there is no mutual consent to contract and no contract formation." *Kahn Creative P'ships, Inc. v. Nth Degree, Inc.*, 2011 U.S. Dist. Lexis 34248, at *12 (C.D. Cal. Mar. 29, 2011) (citations and quotations omitted).

In determining whether an essential element is reserved for future agreement, courts look at the parties' "negotiations that *preceded execution* [of the agreement at issue] to ascertain the key terms under discussion." *Inamed Corp.*, 275 F. Supp. 2d at 1123 (finding that the parties did not discuss the terms during the course of the negotiations, which shows that those terms were not essential).  Courts also look at the parties' conduct *after execution* to determine if the "parties' conduct reflected that there were essential material terms to be negotiated." *Perfumebay.com Inc.*, 506 F.3d at 1179; *see Weddington Productions, Inc. v. Flick*, 60 Cal. App. 4th 793, 796-97, 804-07 (1998) (though the "parties

subjectively thought they had formed" a contract, "subsequent events illustrate quite vividly that they had never agreed on the same terms").

Here, the parties entered into the Oral Agreement in September 2016, in which Gountoumas was to perform certain services in exchange for a 15% ownership interest in Giaran.  Gountoumas performed thereunder.  In late November 2016, Fu demanded that Gountoumas move to Boston.  Gountoumas told him that she could not afford to move without receiving a salary.  The parties then discussed the Proposed Revision.  Fu offered to provide Gountoumas a salary (so that she could move), and, in exchange, Gountoumas would have to reduce her ownership interest from 15% to 10%.  The Consulting Agreement reflected the salary component of the Proposed Revision.  The parties, however, did not agree on the other component, i.e., the equity component.  Thus, there was no meeting of the minds on the Proposed Revision, or any component thereof.

Giaran cannot contend that the Consulting Agreement was a stand-alone enforceable agreement.  The parties' discussions before and after that agreement demonstrate that it was part of an overall revision to the Oral Agreement to provide Gountoumas with a salary and reduce her equity position.  Further, the Consulting Agreement did not require Gountoumas to move to Boston.  It is clear, however, that Giaran and Fu expected her to move because that, too, was part of the *overall* revision to the Oral Agreement – and the Consulting Agreement was only one component of that.

### 3.   *Even If The Parties Entered Into The Consulting Agreement, They Mutually Rescinded It By Abandoning It*

A contract may be "mutually abandoned" by the parties, which operates as a mutual rescission of the contract.  *Martin v. Butter*, 93 Cal. App. 2d 562, 566 (1949) ("abandonment by one party is equivalent to a claim of rescission which may be acquiesced in by the other, thereby effecting a mutual rescission").  "Such abandonment may be shown by **the conduct of the parties** and need not be expressly stated in writing or orally."  *Honda v. Reed*, 156 Cal. App. 2d 536, 537 (1958); *see Martin*, 93 Cal. App. 2d at 566 ("**any words or acts** by one party which indicate that he will not perform the contract,

or permit the other party to do so, amounts to an abandonment") (emphasis added).  "A contract may be mutually abandoned by the parties at any stage of its performance or before any performance has been commenced, and by such abandonment each party is released from any further performance, or, as in the instant action, each party is released from any performance at all."  *Honda*, 156 Cal. App. 2d at 540.

Even if the Consulting Agreement was an enforceable stand-alone agreement, the parties thereafter mutually rescinded it by abandoning it.  After Gountoumas made clear that she was not moving to Boston, Fu sent her an email that repudiated the Consulting Agreement (and the Oral Agreement).  (Gountoumas Decl. ¶ 48, Ex. 5.)  In addition to the email, Fu's conduct demonstrates that he acquiesced in what he perceived to be Gountoumas' breach of the Consulting Agreement – which operates as a mutual rescission.  Thus, the Consulting Agreement cannot serve as a basis to compel arbitration.

**B.  Even If The Consulting Agreement Is Enforceable, The Arbitration Provision Does Not Apply To Gountoumas' Claims**

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  *AT&T Technologies, Inc. v. Communication Workers of Am.*, 475 U.S. 643, 648 (1986).  It follows that "the question of arbitrability—whether [an] agreement creates a duty for the parties to arbitrate the particular grievance—is undeniably an issue for judicial determination."  *Id.*

The arbitration provision here applies to any disputes "arising out of or relating to" the Consulting Agreement.  Such a provision is broad, but it is not boundless.  It reaches those disputes between the parties that have "a significant relationship to the contract" and those disputes that have their "origin or genesis in the contract."  *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721-25 (9th Cir. 1999) (holding that each of the tort claims required a court to interpret the underlying contract).  Thus, before the Court can compel arbitration, it must determine whether the arbitration provision extends to the claims at issue.  *Davies v. Broadcom Corp.*, 130 F. Supp. 3d 1343, 1352 (C.D. Cal. 2015).

*Davies* is instructive.  There, the plaintiff asserted various discrimination and retaliation claims against her former employer.  The defendant moved to compel

1  arbitration based on an arbitration contained in various stock-issuance agreements or

2  "RSU Agreements."  The defendant argued that the claims arise from the RSU

3  Agreements because the complaint alleged that certain male employees unfairly received

4  more stock than plaintiff did.  The Central District rejected that assertion:

> [T]he Court finds that Plaintiff's claims lack a significant relationship to the
> RSU Agreements. The RSU Agreements merely describe the shares awarded,
> the vesting schedule for those shares, and various shareholder rights or
> limitations of those rights.  Plaintiff neither disputes Defendant's performance
> under those agreements nor her own obligations under them.  Her claims are
> for discrimination and retaliation.  Her allegation of disparate stock awards is
> but one of many alleged manifestations of this discrimination and retaliation.
> Indeed, Plaintiff also alleges unequal salaries, unequal job titles, overtly
> demeaning statements, and, at one point, that female employees were forced to
> walk a runway for male employees.  These claims are not significantly related
> to the RSU Agreements.

*Davies*, [130 F. Supp. 3d at 1352-53](#).

Similarly, in *Malhotra v. De Ora*, [673 F. App'x 666](#) (9th Cir. 2016), the motion to

compel arbitration was denied because the plaintiff's claims did not have a significant

relationship to the contract:  "The claims asserted do not require an interpretation of the

contract's terms, do not arise from a failure to perform under the contract, and do not

relate to conduct that could not have occurred but for the contract…. The allegations

disclose that the contract's existence was a mere background fact against which the

conduct at issue here occurred; the relationship of the conduct to the contract is incidental

rather than direct, and accordingly no 'significant relationship' exists."  *Id.* at 668.

This case does not present a close call as to whether the claims have a significant

relationship to the agreement with the arbitration clause.  They do not.  The Complaint is

based on the Oral Agreement reached in September 2016 regarding the promise to give

Gountoumas a 15% equity interest, and the services that she provided from September

2016 through February 2017.  The Consulting Agreement did not even come into effect

until February 1, 2017 (if at all).  And, it does not address Gountoumas' ownership

interest, which is the central issue in dispute.  Further, Giaran never signed the

Consulting Agreement, and neither party ever performed under it.  Certainty,

Gountoumas is not alleging a breach of that agreement.  As in *Malhotra*, the "claims

1  asserted do not require an interpretation of the [Consulting Agreement's] terms, do not

2  arise from a failure to perform under the contract, and do not relate to conduct that could

3  not have occurred but for the contract."  *Malhotra,* 673 F. App'x at 668.

4  **C.    The Arbitration Provision Is Unenforceable Because It Is Unconscionable**

5          An arbitration agreement is not enforceable if it is unconscionable under state law.

6  *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014); *Circuit City Stores v.*

7  *Adams*, 279 F.3d 889, 892 (9th Cir. 2002).  As discussed above, California law governs the

8  issue of contract formation.

9          Under California law, unconscionability has procedural and substantive elements.

10 "Essentially a sliding scale is invoked….  In other words, the more substantively

11 oppressive the contract term, the less evidence of procedural unconscionability is

12 required to come to the conclusion that the term is unenforceable, and vice versa."

13 *Armendariz v. Foundation Health Psychcare Services, Inc.,* 24 Cal. 4th 83, 114 (2000).[3]

14        **1.    The Arbitration Agreement Is Procedurally Unconscionable**

15          "Procedural unconscionability exists when the stronger party drafts the contract

16 and presents it to the weaker party on a 'take-it-or-leave-it basis.'" *Serafin v. Balco*

17 *Properties Ltd., LLC,* 235 Cal. App. 4th 165, 179 (2015).  "[T]o determine whether an

18 arbitration agreement is procedurally unconscionable, courts focus on "two factors:

19 oppression and surprise."  *Tiri v. Lucky Chances, Inc.*, 226 Cal. App. 4th 231, 245 (2014).

20              **a.    The Agreement Is Oppressive**

21          "Oppression arises from an inequality of bargaining power, when one party has no

22 real power to negotiate or [make] a meaningful choice."  *Carmona v. Lincoln Millennium*

23 *Car Wash,* 226 Cal. App. 4th 74, 84 (2014).  "A finding of a contract of adhesion is

24

25 [3] Giaran contends that *Armendariz*'s unconscionability doctrine does not apply because
26 Gountoumas was an independent contractor, not an employee.  (Moving Br. 14:19-24.)
   But, that classification is a disputed issue in this case; Gountoumas alleges that she was
27 either a 15% shareholder *or an employee*.  In any event, *Armendariz* has been applied to
   independent contractors.  *See Wherry v. Award, Inc.*, 192 Cal. App. 4th 1242, 1249 (2011);
28 *Samaniego v. Empire Today, LLC*, 205 Cal. App. 4th 1138, 1143-47 (2012); *Gutierrez v.*
   *Carter Bros. Sec. Servs.*, *LLC*, 63 F. Supp. 3d 1206, 1212-14 (N.D. Cal. 2015).

1  essentially a finding of procedural unconscionability." *Baxter v. Genworth North Am.*
2  *Corp.*, 16 Cal. App. 5th 713, 723 (2017).

3        There was a significant inequality of bargaining power, such that Gountoumas had
4  no real power to make a meaningful choice. In late November 2016, Fu demanded that
5  Gountoumas revise the Oral Agreement and to move to Boston.  When Gountoumas
6  asked Fu what would happen if she did not agree to revise their agreement and to move to
7  Boston, Fu said he would pay her a mere $100 for the hundreds of hours that she already
8  had worked.  Gountoumas felt powerless to negotiate better or different terms, given that
9  (a) Fu was threatening to pay her virtually nothing for the hundreds of hours she already
10  had worked (b) she had delivered much of what Giaran had expected of her at that stage,
11  and (c) she had no writing to memorialize the Oral Agreement.  Thus, Gountoumas felt
12  that she had no choice but to sign the Consulting Agreement in hopes that Giaran and Fu
13  would not take away the equity interest for which she had worked so hard.

14        **b.    There Was Also "Unfair Surprise"**

15        "Unfair surprise results from misleading bargaining conduct or other circumstances
16  indicating that a party's consent was not an informed choice." *Sanchez v. Western Pizza*
17  *Enterprises, Inc.*, 172 Cal. App. 4th 154, 173 (2009).  For example, unfair surprise arises
18  where the arbitration provision is hidden "in a mass of fine print," or if the employer
19  "failed to draw … attention to the arbitration provision or explain its import." *Penilla v.*
20  *Westmont Corp.*, 3 Cal. App. 5th 205, 216-17 (2016).

21        Here, too, Giaran did not draw Gountoumas' attention to the arbitration provision
22  or explain its import.  Instead, Fu made it clear that she needed to sign this document
23  before the parties negotiated a written stock ownership agreement that would replace the
24  Oral Agreement, which was far more economically significant to Gountoumas.

25        **2.    The Arbitration Agreement Is Substantively Unconscionable**

26        Substantive unconscionability exists when a contract imposes "overly harsh"
27  terms. *Armendariz*, 24 Cal. 4th at 114.  "[A]rbitration agreements that encompass
28  unwaivable statutory rights must be subject to particular scrutiny." *Id.* at 100.  "[T]o

15

ensure mandatory arbitration agreements are not used to curtail an employee's statutory rights that cannot be waived, minimum requirements (the *Armendariz* requirements) must be present to ensure that arbitration will not be used as a vehicle for the waiver of statutory rights." *Truly Nolen of Am. v. Superior Ct.*, 208 Cal. App. 4th 487, 499 (2012).

### a. *The Choice Of Law Provision Will Force Gountoumas To Give Up Her Claims Under the California Labor Code*

The choice of law clause in the agreement is unconscionable because it violates Labor Code Section 925(a)(2), which, as discussed above, states that an employer may not require a California employee to adjudicate her claims outside of California, and may not deprive the employee of the substantive protection of California law.

Further, courts have held that a foreign-state choice of law clause in an arbitration agreement is unconscionable, if a California resident is alleging non-waivable statutory claims. The choice of law clause would constitute an impermissible waiver of those statutory claims. *Lang v. Skytap, Inc.*, 2018 U.S. Dist. Lexis 182701, *14 (N.D. Cal. Oct. 24, 2018); *Verdugo v. Alliantgroup, L.P.*, 237 Cal. App. 4th 141, 149, 154 (2015).

In *Verdugo*, the court held that a choice of law and forum selection clause in an employment agreement was unenforceable because it operated as a waiver of the plaintiff's rights under the Labor Code. 237 Cal.App.4th at 149, 154; *see Wimsatt v. Beverly Hills Weight Loss Clinic Int'l*, 32 Cal. App. 4th 1511, 1519 (1995) (choice of law clause cannot be used to "circumvent those unwaivable rights").

The Northern District applied these cases in the context of an unconscionability challenge to an arbitration agreement. In *Lang,* 2018 U.S. Dist. Lexis 182701, the court determined that the "choice of law provision … requires Plaintiff to give up California claims," which are not waivable claims under the Labor Code. *Id.* at *14. As a result, this provision rendered the agreement unconscionable. *Id.; see Vargas v. Delivery Outsourcing, LLC*, 2016 U.S. Dist. Lexis 32634, at *31 (N.D. Cal. Mar. 14, 2016) (choice of law clause rendered arbitration clause unconscionable because it would deprive plaintiff of statutorily protected rights). Further, a defendants' later offer to arbitrate under

1   California law is irrelevant, because "contracts [are] analyzed for unconscionability at the

2   time they are made." *Lang,* 2018 U.S. Dist. Lexis 182701 *14.

3       Here, the Massachusetts choice of law clause would mean that Gountoumas cannot

4   pursue her non-waivable claims under the California Labor Code. The agreement forces

5   Gountoumas to waive those rights, which renders it unconscionable under California law.

6           **b.   The Forum Selection Provision Will Force Gountoumas To
                    Incur Substantial Expenses That She Cannot Afford**

7       The forum selection clause is unconscionable because it violates Labor Code

8   Section 925(a)(1), as discussed above.

9       Further, courts have held that a forum selection provision is unconscionable if its

10  "place and manner" restrictions are "unduly oppressive," *Bolter v. Superior Court*, 87 Cal.

11  App. 4th 900, 909-910 (2001) or it has the effect of shielding the stronger party from

12  liability, *Comb v. PayPal, Inc.*, 218 F. Supp. 2d 1165, 1177 (N.D. Cal. 2002). In *Bolter*, the

13  forum selection clause was "unduly oppressive," where California franchisees had to

14  travel to Utah to arbitrate claims against an international franchisor. *Id.* at 909.

15      The Ninth Circuit reached the same conclusion in *Nagrampa v. MailCoups, Inc.,*

16  469 F.3d 1257 (9th Cir. 2006). The court held that the forum selection clause was

17  unconscionable where it would "require a one-woman franchise who operates from her

18  home to fly across the country to arbitrate…" and to "incur additional traveling and living

19  expenses and increased costs associated in having counsel familiar with Massachusetts

20  law…. She may not be able to maintain her claim to recover any of her losses if forced to

21  do so in Massachusetts." *Id.* at 1289-90 (citations omitted).

22      Here, Gountoumas cannot litigate this case in Massachusetts. First, she cannot

23  afford the travel expenses of flying across the country and staying in a hotel to attend trial

24  or depositions. Second, she recently gave birth to her daughter, which precludes from

25  travelling to litigate this case. (Gountoumas Decl., ¶¶ 52-57.) By contrast, Giaran is now

26  owned by Shiseido Americas, a subsidiary of a Japanese company, and is headquartered

27  in New York with more than 5,000 employees worldwide. (Yadegar Decl. ¶ 7.)

28

### c.   *The Agreement Requires Gountoumas To Pay For One-Half the Cost of Arbitration*

An arbitration agreement that requires an employee to bear any of the expenses unique to arbitration is unconscionable.  *Armendariz*, 24 Cal. 4th at 110–111; *Carlson v. Home Team Pest Defense, Inc.*, 239 Cal. App. 4th 619, 636 (2015); *see Circuit City Stores, Inc.*, 279 F.3d at 894 (requiring the employee to split arbitration fees with the employer "render[s] an arbitration agreement unenforceable").

Further, an employer's "after-the-fact expression of willingness" to pay for all the costs is irrelevant.  *Martinez v. Master Protection Corp.,* 118 Cal. App. 4th 107, 116; (2004); *Carlson,* 239 Cal. App. 4th at 636-637 (rejecting defendant's willingness to bear all costs, and noting that "similar after-the-fact attempts to avoid the effect of an unconscionable provision have been rejected").

Here, the AAA rules provide that the Claimant pay a filing fee of $8,475 (based on the amount in dispute), and split the arbitrator's fees.  The arbitrator fee will likely exceed $50,000.  (Yadegar Decl. ¶¶2-5; Exs. 10-11.)  Gountoumas cannot afford those fees and would drop this claim if she is forced to arbitrate. (Gountoumas Decl. ¶¶ 54-56).

### d.   *The Agreement Imposes The Wrong Standard For The Recovery of Attorneys' Fees*

The arbitration provision states that the prevailing party is entitled to attorneys' fees and costs, and that the prevailing party is "that party who may be fairly said by the arbitrator(s) to have prevailed on the major disputed issues."  This standard is inconsistent with California law, as to the Labor Code claims at issue.

Under California law, attorneys' fees are recoverable by a prevailing plaintiff for non-payment of wages under the Labor Code.  But, prevailing employers can recover attorneys' fees ***only if*** the lawsuit was brought in "***bad faith.***"  Cal. Lab. Code § 218.5; *Arave v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 19 Cal. App. 5th 525, 545 (2018).

California courts have held that the inclusion of such an attorneys' fees provision renders the arbitration agreement unconscionable.  *Ajamian v. CantorCO2e, L.P.*, 203 Cal. App. 4th 771, 800 (2012) (arbitration agreement that states that "prevailing party is entitled

to attorney fees, without any limitation for a frivolous action or one brought in bad faith … violates *Armendariz*"); *Trivedi v. Curexo Technology Corp.*, 189 Cal. App. 4th 387, 394-95 (2010) (arbitration agreement that "allows for the recovery of attorney fees and costs by the prevailing party in an arbitration" was substantively unconscionable because it improperly gave the arbitrator the power to assess attorneys' fees against a losing employee even if the action was not frivolous or brought in bad faith.)

>        **e.    The Agreement Does Not Provide Any Appellate Rights**

An arbitration of statutory claims must allow for "judicial review sufficient to ensure the arbitrators comply with the requirements of the statute." *Armendariz,* 24 Cal. 4th at 106; *Pearson Dental Supplies, Inc. v. Superior Court*, 48 Cal. 4th 665, 679 (2010) (judicial review ensures that plaintiff can vindicate his statutory claim in arbitration).

Here, neither the arbitration provision nor the AAA rules say anything about appellate rights.  In light of this silence, the default rules under the Code of Civil Procedure apply, which provide appellate rights in arbitrations in very specific and narrow circumstances, such as fraud, corruption, and arbitrator misconduct.  Cal. Civ. Proc. Code § 1286.2.  This narrow provision does not provide judicial review that is sufficient to ensure that the arbitrator complies with the requirements of the Labor Code.[4]

>        **f.    The Agreement Denies Adequate Discovery**

"The denial of adequate discovery in arbitration proceedings leads to the de facto frustration of the employee's statutory rights…. [A]dequate discovery is indispensable for the vindication" of employment claims.  *Armendariz,* 24 Cal. 4th at 104.  Thus, plaintiffs "are at least entitled to discovery sufficient to adequately arbitrate their statutory claim, including access to essential documents and witnesses."  *Id.* at 105.

In *Fitz v. NCR Corp.*, 118 Cal. App. 4th 702 (2004), the arbitration agreement limited the parties to two depositions, unless the arbitrator allowed more.  This provision was held unlawful.  "Though [the employer] contends that the [agreement's] limits on discovery are

---

[4] The same result would apply under Massachusetts' default arbitration rules. *See* Mass. Ann. Laws ch. 251, § 12.

1  mutual because they apply to both parties, the curtailment of discovery to only two

2  depositions does not have mutual effect and does not provide Fitz with sufficient discovery

3  to vindicate her rights.  This is because the employer already has in its possession many of

4  the documents relevant to an employment discrimination case as well as having in its

5  employ many of the relevant witnesses." *Id.* at 716 (citations omitted).

6      Here, the AAA rules do not allow the parties to conduct *any* depositions.  The

7  discovery rule, Rule 22, only allows for exchange of documents.  (Yadegar Decl., Ex. 11,

8  at p. 19.)  There is an additional rule that applies in "large, complex commercial disputes."

9  But, even there, depositions are limited to "exceptional cases, at the discretion of the

10  arbitrator, upon good cause shown and consistent with the expedited nature of

11  arbitration," and only if the arbitrator determines the person has information that is

12  "relevant and material to the outcome of the case."  And, "the arbitrator may allocate the

13  cost of taking such a deposition."  (Yadegar Decl., Ex. 11, at p. 38, Rule L-3(f.).

14  Further, the rules do not allow third party discovery or written discovery.

15      Further, Giaran did not provide the AAA rules to Gountoumas before she signed

16  the agreement.  (Gountoumas Decl., at ¶ 58.)  The state Supreme Court has said that

17  courts must "closely scrutinize the substantive unconscionability of terms that were

18  'artfully hidden' by the simple expedient of incorporating them by reference rather than

19  including them in or attaching them to the arbitration agreement."  *Baltazar v. Forever*

20  *21, Inc.,* 62 Cal. 4th 1237, 1246 (2016).

21          ***3.    The Unconscionable Provisions Are Not Severable***

22      "If the central purpose of the contract is tainted with illegality, then the contract as a

23  whole cannot be enforced."  *Armendariz,* 24 Cal. 4th at 124.  "When an arbitration agreement

24  contains multiple unconscionable provisions, such multiple defects indicate a systematic

25  effort to impose arbitration on an employee not simply as an alternative to litigation, but as

26  an inferior forum that works to the employer's advantage."  *Carmona,* 226 Cal. App. 4th at 55;

27  *Martinez,* 118 Cal. App. 4th at 19.

28

Further, a court is not permitted to "reform" an agreement "by augmenting it with additional terms" or otherwise "reforming the agreement to make it lawful." *Armendariz*, 24 Cal. 4th at 125. A court's "power to reform [is] limited to instances in which parties make mistakes, not to correct illegal provisions." *Id.; see Martinez,* 118 Cal. App. 4th at 119 (agreement was "permeated with unconscionability it could only be saved, if it all, by a reformation beyond our authority"). Moreover, it is irrelevant that the employer is willing now to alter the agreement to make it more fair. The issue is whether "the arbitration agreement ***as written*** is unconscionable and contrary to public policy…. No existing rule of contract law permits a party to resuscitate a legally defective contract merely by offering to change it." *Armendariz,* 24 Cal. 4th at 125.

Here, the agreement suffers from multiple unconscionable provisions. Further, any attempt to save the agreement would require a wholesale reformation, such as the creation of discovery and appellate procedures – in addition to striking out the illegal provisions relating to choice of law, venue selection, recovery of attorneys' fees, and arbitration costs.

**D.      The Court, Not The Arbitrator, Must Determine Arbitrability**

Finally, Giaran contends that the parties delegated the issues of arbitrability to the arbitrator, because of the incorporation of the AAA rules. Giaran is wrong. As set forth below, "[t]here are two prerequisites for a delegation clause to be effective: (1) the language must be clear and unmistakable and (2) the delegation clause must not be revocable under state contract law such as for fraud, duress, or unconscionability." *Pompliano v. Snap, Inc.*, 2018 U.S. Dist. Lexis 107357, **7-8 (C.D. Cal. April 11, 2018); *see Mohamed v. Uber Techs, Inc.*, 848 F.3d 1201, 1205 (9th Cir. 2016).

In making this determination, the "presumption in favor of arbitrat[ion]" does not apply. *Pompliano*, 2018 U.S. Dist. Lexis 107357, *7; *see Mohamed*, 848 F.3d at 1209. To the contrary, the presumption is reversed: "Courts should presume that they determine arbitrability absent 'clear and unmistakable' evidence that the parties agreed to delegate that question to an arbitrator." *Mikhak v. Univ. of Phoenix*, 2016 U.S. Dist. Lexis 80705 (N.D. Cal. June 21, 2016); *see Anderson v. Pitney Bowes, Inc.*, 2005 U.S. Dist. Lexis 37662,

1  *8 n. 6 (N.D. Cal. May 4, 2005) ("The general presumption favoring arbitration is

2  reversed when deciding *who* primarily should decide arbitrability ….").

3         **1.   *The Agreement Does Not "Clearly And Unmistakably" Delegate
The Gateway Issues To Arbitration, Particularly In Light of
Gountoumas' Lack of Sophistication In Legal Matters***

5       As to the first prerequisite, a court must determine the gateway issues of

6  arbitrability "unless the parties *clearly and unmistakably provide otherwise.*"  *Mohamed,*

7  848 F.3d at 1205.  "Clear and unmistakable evidence of an agreement to arbitrate

8  arbitrability might include a course of conduct demonstrating assent or an express

9  agreement to do so."  *Id.* (citations, ellipses omitted).  Clear and unmistakable evidence is

10  a "heightened standard."  *Rent-A-Center v. Jackson,* 561 U.S. 68, 69 & n.1 (2010).

11       In making this determination, courts "must first consider the position of those

12  parties," *i.e.*, their relative sophistication.  *Mikhak,* 2016 U.S. Dist. Lexis 80705 * 9.  This is

13  because the "'clear and unmistakable requirement' 'pertains to the parties' *manifestation*

14  *of intent*,' *i.e.*, it is an 'interpretive rule' that is based on an 'assumption about the parties'

15  expectations.'"  *Yan Guo v. Kyani, Inc.*, 311 F. Supp. 3d 1130, 1156 (C.D. Cal. 2018)

16  (quoting *Rent-A-Center,* 561 U.S. at 69 & n.1); *see Meadows v. Dickey's Barbecue Rests.,*

17  *Inc.*, 144 F. Supp. 3d 1069, 1078 (N.D. Cal. 2015) ("Whether the language of a delegation

18  clause is "clear and unmistakable" should be viewed from the perspective of the

19  particular parties to the specific contract at issue.  What might be clear to sophisticated

20  counterparties is not necessarily clear to less sophisticated employees or consumers.")

21       Applying these principles, a court in the Central District held that, where the party

22  resisting arbitration is not sophisticated, clear and unmistakable intent to delegate is not

23  shown "solely by the incorporation by reference of the rules of the AAA."  *Yan Guo*, 311

24  F. Supp. 3d at 1156.  The plaintiffs in that case were not considered sophisticated, even

25  though they were businessmen who had entered into a distribution agreement.  *Id.*

26       A court in the Northern District went a step further in *Mikhak,* 2016 U.S. Dist. Lexis

27  80705.  There, the agreement contained an *explicit* delegation clause, and did not merely

28  rely on incorporating the rules of the arbitral body.  *Id.* at *12.  The plaintiff was a

**PLAINTIFF'S OPPOSITION TO THE MOTION TO COMPEL ARBITRATION**

professor with advanced degrees in epidemiology.  *Id.* at **13-14.  Nevertheless, the court found that she was not sophisticated in *legal matters*.  *Id.*  Thus, there was no clear and unmistakable intent to delegate arbitrability.  *Id.* at **14-15); *accord*, *Meadows*, 144 F. Supp. 3d at 1078-79 (no "clear and unmistakable evidence" that franchisees intended an arbitrator to decide questions of arbitrability because the franchisees were "far less sophisticated" than the franchisor-defendant, and there was no evidence that any of the franchisees "had legal training or experience dealing with complicated contracts"); *Ingalls v. Spotify USA, Inc.*, 2016 U.S. Dist. Lexis 157384 (N.D. Cal. Nov. 14, 2016) ("Every district court decision in our circuit to address the question since *Brennan* has held that incorporation of the AAA rules was insufficient to establish delegation in consumer contracts involving at least one unsophisticated party."); *Tompkins v. 23andMe, Inc.*, 2014 U.S. Dist. Lexis 88068, at *42 (N.D. Cal. June 25, 2014) ("There is good reason not to extend this doctrine from commercial contracts between sophisticated parties to online click-through agreements crafted for consumers.  … [I]ncorporation of the AAA rules does not necessarily amount to "clear and unmistakable" evidence of delegation, particularly when the party asked to accept the agreement is a consumer").

Here, there is no explicit delegation clause – only a reference to the AAA rules, which were not even attached.  Gountoumas is not sophisticated with legal matters. (Gountoumas Decl., at ¶ 58.)  The reference to the AAA rules does not demonstrate that Gountoumas clearly and unmistakably delegated the arbitrability to an arbitrator.

### 2.   *Even If the Delegation Clause Was "Clear And Unmistakable," The Delegation Provision Is Itself Unconscionable*

Even where the delegation was clear and unmistakable, a delegation provision is not enforceable if, under state law, the provision is unconscionable.  *Rent-A-Center*, 561 U.S. at 68-73; *Mohamed*, 848 F.3d at 1210; *Pompliano*, 2018 U.S. Dist. Lexis 107357, at **7-8. "[A]ny claim of unconscionability must be *specific to the delegation clause*." *Rent-A-Center*, 561 U.S. at 73; *see Brennan*, 796 F.3d at 1132-33.

**PLAINTIFF'S OPPOSITION TO THE MOTION TO COMPEL ARBITRATION**

1    Here, as to procedural unconscionability, the delegation clause was presented

2    along with the rest of the Consulting Agreement, which Gountoumas was pressured to

3    accept.  The discussion above about procedural unconscionability of the agreement

4    applies to this specific provision.  *Pinela v. Neiman Marcus Group, Inc.,* 238 Cal. App. 4th

5    227, 243 (2015) ("For the same reasons that we conclude the delegation clause is part of a

6    contract of adhesion, we conclude it is procedurally unconscionable.")

7    As to substantive unconscionability, the delegation clause suffers from defects that

8    are specific to this clause.  A delegation clause is unconscionable as applied to a

9    California plaintiff, if the agreement also contains a foreign-state choice of law clause.

10   *Pinela,* 238 Cal. App. 4th at 246.  *Pinela* is on point and should be followed here.[5]

11   There, the arbitration agreement contained a delegation clause and a Texas choice

12   of law clause.  The court held that the combination of these clauses rendered the

13   delegation clause unconscionable as against a California plaintiff, because they would

14   preclude him from asserting, at the arbitration, California defenses to the agreement as a

15   whole.  *Pinela*, 238 Cal. App. 4th at 246 ("The elimination of [plaintiff's] ability to contend

16   that the … Arbitration Agreement as a whole is unconscionable under California law

17   renders the delegation clause substantively unconscionable."); *see id.* at 246 (the choice of

18   law provision renders the delegation clause unconscionable because it "unfairly restricts

19   the legal arguments that he can make if he is required to arbitrate his claim that the …

20   Arbitration Agreement is unconscionable").

21   Further, the court said that it was unnecessary to compare the states' laws.  It was

22   enough that the agreement eliminated the plaintiff's ability to argue unconscionability

23   using California public policy as a measuring stick for enforceability.  *Id.* at 246-249.

24

25

26   [5] Under the FAA, federal courts must look to state court decisions in applying an
     unconscionability defense to an arbitration agreement.  In doing so, federal courts
27   "should follow a published intermediate state court decision regarding California law
     unless [the court is] convinced that the California Supreme Court would reject it."
28   *Tompkins v. 23andMe, Inc.*, 834 F.3d 1019, 1024-25 (9th Cir. 2016)

**PLAINTIFF'S OPPOSITION TO THE MOTION TO COMPEL ARBITRATION**

1    Here, too, because of the agreement's choice of law provision, the arbitrator would

2    be precluded from applying California unconscionability standards in determining

3    whether the agreement as a whole is unconscionable.  Thus, by eliminating Gountoumas'

4    ability to contend that the Consulting Agreement as a whole is unconscionable under

5    California law, the delegation clause is substantively unconscionable.

6           The delegation clause is further unconscionable because of the venue selection

7    provision.  As discussed above, the agreement requires the arbitration to occur in

8    Massachusetts.  The delegation clause – when read in conjunction with the venue clause

9    – would require Gountoumas to travel across the country to initiate a costly arbitration so

10   that the arbitrator can decide the threshold issue of whether the dispute is arbitrable.  This

11   would add thousands of dollars in expense to this case, which Gountoumas cannot afford.

12          Nor would it make any practical sense to force Gountoumas to initiate an

13   arbitration to determine whether the agreement even covers this dispute.  This case is

14   atypical in that the issue of arbitrability is not a close call.  To this end, if the Court

15   reaches this issue, the Court can and should perform a limited review of the agreement to

16   determine whether it covers the dispute.  The moving brief concedes that, even where

17   there is a valid delegation clause, it is appropriate for the Court to conduct a "facial and

18   limited review" of the agreement.  (Moving Br. 8:4-5l.) *See Pompliano*, 2018 U.S. Dist.

19   Lexis 107357, **6-7 (determining that the arbitration agreement covers the dispute, before

20   deciding whether the delegation clause was enforceable).

21          As discussed above, even upon a limited/facial review, the claims do not arise from

22   the Consulting Agreement.  Gountoumas should not be forced to spend thousands of

23   dollars in travel expenses and fees to confirm what is patently obvious.

24   **V.    CONCLUSION**

25          The motion to compel arbitration should be denied, so that Gountoumas could have

26   her day in court.

27   DATED:  October 29, 2018                     YADEGAR, MINOOFAR & SOLEYMANI, LLP
                                                 By:___/ns/_____
                                                     Navid Soleymani,
28                                                   Attorneys for Plaintiff